**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

DANA N. DAVIS,

                     Plaintiff,

            -against-

NANCY BERRYHILL, Acting Commissioner
of Social Security,

                   Defendant.

-----------------------------------------------------------x

17-CV-7052 (AT) (OTW)

**REPORT & RECOMMENDATION**

ONA T. WANG, United States Magistrate Judge:

**TO THE HONORABLE ANALISA TORRES, United States District Judge,**

I. **Introduction**

Plaintiff Dana N. Davis commenced this action pursuant to 42 U.S.C. § 405(g), challenging the decision by the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 405(g). The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF 17, 21). Plaintiff seeks an order reversing the Commissioner's decision that Plaintiff is not disabled or, in the alternative, an order remanding her claim for a new administrative hearing.

 For the reasons set forth below, I respectfully recommend that the Commissioner's motion be **DENIED**, and that Plaintiff's motion be **GRANTED** to the extent that the case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.

## II.    Facts[1]

### A.  Procedural Background

Plaintiff filed an application for DIB on March 27, 2014, alleging that she became disabled on November 21, 2013 due to lower back pain, a herniated disc, left sacroiliac joint pain, muscle spasms, and lumbar radicular pain. (Tr. 116–22, 138, 141–49). The claim was initially denied on August 11, 2014, (Tr. 60), and Plaintiff requested a hearing before an Administrative Law Judge. (Tr. 64). On August 3, 2016, Plaintiff appeared with an attorney representative at a hearing before ALJ Brian Lemoine. (Tr. 26–50). On December 16, 2016, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr. 8–25). Plaintiff requested a review of the decision, which the Appeal Council denied. (Tr. 1–7).

### B.  Social Background

Plaintiff was born on January 8, 1977 and was 36 years old at her alleged disability onset date, November 21, 2013. (Tr. 114, 116). She never finished high school or obtained a GED, (Tr. 36), and previously worked as a custodian for the City of New Rochelle School District. (Tr. 35, 129). On November 21, 2013, Plaintiff was lifting a bag of discarded school supplies which was heavier than she expected, causing her back pain. (Tr. 143).

Plaintiff stated that she has constant pain, making it hard for her to walk, sit, or sleep. (Tr. 28). She further stated that walking upstairs, carrying groceries, and doing laundry are difficult tasks for her to perform. (Tr. 29). Plaintiff stated that she can sit for about one hour

---

[1] Only the facts relevant to the Court's review are set forth here. Plaintiff's medical history is contained in the administrative record that the Commissioner filed in accordance with 42 U.S.C. § 405(g). (*See* Administrative Record, dated March 15, 2018, ECF 12 ("Tr.")).

before having to stand up due to pain and/or stiffness. (Tr. 36). Plaintiff also stated that she can dress and undress herself if she is not in great pain, (Tr. 38), that she can wash herself with difficulty, (*id.*), and can purchase prepared foods for herself and her children. (Tr. 41).

Plaintiff stated that in a typical day, she will "try to do" light housework, such as sweeping, mopping, and gathering clothing for laundry. (Tr. 30). She stated that when she wakes up, she experiences pain in her lower back and shoulder, which causes her to take around ten minutes to get out of her bed. (*Id.*)

**C. Medical Background**

**1. Medical Treatment Prior to Alleged Onset Date of November 21, 2013**

**a. Dr. Steven Klass, Neurologist**

Before Plaintiff's injury on November 21, 2013, Plaintiff suffered two work-related injuries, one in 2011 and the other in 2012. (Tr. 316). Plaintiff began treatment with Stephen Klass, M.D., on June 30, 2012. (Tr. 188–91). Despite experiencing sharp pain in her lower back that traveled down her left leg, Plaintiff was nonetheless alert and oriented. (Tr. 188–89). To offset the pain, Dr. Klass prescribed Plaintiff Celebrex. (Tr. 190).

A July 18, 2012 Magnetic Resonance Image (MRI) of Plaintiff's spine showed a shallow, central bilateral disc herniation[2] at L5-S1, mild grade 1 retrolisthesis[3] at the L5-S1 level, minor

---

[2] Herniation is "the abnormal protrusion of an organ or other body structure through a defect or natural opening in a covering, membrane, muscle, or bone." *Dorland's Illustrated Medical Dictionary,* 852 (32nd ed. 2012).

[3] Retrolisthesis is a retrospondylolisthesis, which is the "posterior displacement of one vertebral body on the subjacent body." *Dorland's Illustrated Medical Dictionary,* 1636 (32nd ed. 2012).

bilateral facet arthropathy[4] at the L5-S1 level, minimal asymmetric disk bulge at the L4-L5 level, and loss of the normal lumbar lordosis[5]. (Tr. 192–93). On July 26, 2012, October 9, 2012, and November 8, 2012, Dr. Klass noted that Plaintiff's degree of disability was 100%. (Tr. 185–87). Moreover, on November 27, 2012, Dr. Klass opined that Plaintiff "remains totally disabled." (Tr. 184). Plaintiff was taking large quantities of Aleve to control her pain. (Tr. 184).

During a visit with Dr. Klass on April 4, 2013, Dr. Klass noted that Plaintiff has "accepted the fact that she is unable to [live] with her present degree of pain." (Tr. 182). Dr. Klass scheduled her for lumbar surgery. (Tr. 182). On May 20, 2013, Dr. Klass determined that Plaintiff was likely suffering from left sacroiliac[6] dysfunction, which was causing her pain. (Tr. 181). A neurosurgeon found that she was not a candidate for surgery because her injury was likely a soft tissue injury. (Tr. 181). On June 11, 2013, Dr. Klass found that while Plaintiff had improved and her degree of disability was moderate, she was still unable to return to work and that she would "not be able to return to her prior job description." (Tr. 180). On July 18, 2013, Dr. Klass found Plaintiff's degree of disability to be mild to moderate based on subjective complaints and that she was suffering from left sciatic notch pain to palpation. (Tr. 179).

---

[4] Arthropathy is defined as "any joint disease." *Dorland's Illustrated Medical Dictionary,* 158 (32nd ed. 2012). *See also* facet osteoarthritis, also known as facet joint arthropathy, which is a "type of spondyloarthritis centered in facet joints, with disc degeneration and pain; it is most common in the lumbar region and also occurs in the cervical region." *Dorland's Illustrated Medical Dictionary,* 1344 (32nd ed. 2012).

[5] "Lumbar" "pertain[s] to the loins, the parts of the sides of the back between the thorax and the pelvis." *Dorland's Illustrated Medical Dictionary,* 1076 (32nd ed. 2012). Lumbar lordosis is "the dorsally concave curvature of the lumbar vertebral column when seen from the side." *Dorland's Illustrated Medical Dictionary,* 1074 (32nd ed. 2012).

[6] Sacroiliac "pertain[s] to the sacrum and ilium, denoting the joint or articulate between the sacrum and ilium and the ligaments associated therewith." *Dorland's Illustrated Medical Dictionary,* 1662 (32nd ed. 2012). *See also* sacrum "the triangular bone just below the lumbar vertebrae." *Id*.

Additionally, her lumbar range of movement was 66% normal. (Tr. 179). On November 11, 2013, Plaintiff was still showing similar symptoms and Dr. Klass found that her degree of disability was 100% and that she should restart physical therapy. (Tr. 177).

  b.  Dr. Mark Weigle, Physiatrist

Dr. Klass referred Plaintiff to be examined by Mark Weigle, M.D. Dr. Weigle first examined Plaintiff on August 14, 2012. (Tr. 198–200). Dr. Weigle found Plaintiff to be well developed and well nourished. (Tr. 199). Additionally, he found that she had left lumbosacral radiculopathy,[7] probable S1 distribution with an underlying bulging disc at L4-5, and possible shallow disc herniation or bulging disc at L5-S1. (Tr. 200). He suggested that Plaintiff start physical therapy, start gabapentin, continue taking naproxen and flexeril, and take Percocet if her stomach could handle it. (*Id*.) Additionally, he recommended that she consider lumbar epidural injections in the following weeks if there was no improvement and that she consider a home TENS[8] unit. *Id*.

Dr. Weigle re-examined Plaintiff on September 4, 2012 and September 25, 2012. (Tr. 201–03). Plaintiff continued to complain of radicular symptoms and pain going down from her left lower extremity into the buttocks. (Tr. 201). On October 21, 2012, Dr. Weigle opined that Plaintiff had remained out of work and that given the "severe nature of her back," she would be unable to perform the type of work her job requires. (Tr. 201).

---

[7] Lumbosacral radiculopathy is the "disease of nerve roots of the lumbar and sacral segments of the spinal cord." *Dorland's Illustrated Medical Dictionary,* 1571 (32nd ed. 2012).

[8] A TENS (transcutaneous electrical nerve stimulation) unit is an electrical stimulator. (*See* R. 200).

Plaintiff had a nerve conduction and electromyography (EMG) study done. (Tr. 208–11). Per Dr. Weigle's nerve conduction & EMG Report dated November 6, 2012, Dr. Weigle suggested that Plaintiff could return to work with no restrictions. (Tr. 210). Dr. Weigle re-examined Plaintiff on December 6, 2012. (Tr. 211). During the December 2012 re-examination, Dr. Weigle stated that while Plaintiff "doesn't feel that [she] can return to janitor type work," nonetheless, "her disability level according to the Oswestry Disability Index is only an 8% at this point." (Tr. 211).

 At her January 13, 2013 re-examination, Dr. Weigle found that Plaintiff was doing "extremely well" and "otherwise ha[d] very low disability." (Tr. 212). Moreover, he found that she had full motor power in the lower extremities and while she had tenderness in the left SI joint, she had good flexion and extension. (Tr. 212). Despite the improvement, she began to decline, and on April 5, 2013, she stated that her condition had gotten worse. (Tr. 215). Additionally, her Oswestry disability index 2.0 had increased from 22% to 34%. (*Id*.) When Dr. Weigle performed her physical examination, which did not include her hip girdle (since it was not fully tested), she had good motor power throughout her lower extremities. (*Id*.) Her gait on level surfaces was steady and she had symmetric reflexes in her knee and ankle jerks. (*Id*.)

   c. <u>Dr. Zitzmann: Independent Medical Examiner</u>

In connection with her Workers' Compensation application, Dr. Zitzmann's first Independent Medical Examination ("IME") of Plaintiff occurred on February 15, 2013. (Tr. 303–05). Dr. Zitzmann found Plaintiff's gait to be slow, but Plaintiff had "no limp and no antalgic

[gait][9] component." (Tr. 304). Dr. Zitzmann further found that Plaintiff did poorly on motor testing and complained when raising her leg, bending her knee, and moving her foot, although there were no "objective positive orthopedic and neurologic findings." (Tr. 304–05). Despite her poor performance, motor testing revealed that there were no differences in her left and right side motor power. (*Id*.) Upon examination, he found that Plaintiff had a "partial marked degree of disability subjectively, without significant positive MRI findings, or EMG findings." (*Id*.) Additionally, no atrophy was noted. (*Id*.) Dr. Zitzmann further found that Plaintiff's complaints were subjective, and, in his opinion, were "quite markedly exaggerated." (*Id*.) Dr. Zitzmann opined that since she had "reached maximum medical improvement" and that "[n]o treatment has really been significantly helpful," he did "not know of any other treatment that [could] be successfully rendered to her." (*Id*.)

Dr. Zitzmann's second IME took place on August 5, 2013. (Tr. 298–300). Dr. Zitzmann stated that although an MRI did not show any significant findings, he found a mild degree of atrophy in the left leg, limitation of back movement, positive straight leg raising, and left sacroiliac tenderness. (Tr. 299). Dr. Zitzmann further found that Plaintiff would be unable to return to her earlier duties as a custodian and that she was instructed to avoid "bending or lifting," and told that any "carrying should be limited to 20 pounds." (Tr. 300). Dr. Zitzmann also opined that based on her MRI and EMG findings, surgery should not be done. (Tr. 300).

---

[9] An antalgic gait is a gait that develops as a way to avoid pain when walking. *Dorland's Illustrated Medical Dictionary,* 97 (32nd ed. 2012).

d. <u>Dr. Christian Brotea, Orthoepedist</u>

Christian Brotea, M.D., an orthopedic surgeon, examined Plaintiff on April 9, 2013. (Tr. 318–20, *repeated* 336–38). Dr. Brotea first performed a general examination on Plaintiff, where he found that Plaintiff's head, eyes, ears, nose, neck, skin, heart, lungs, chest, and pulses were all normal. (Tr. 318). Dr. Broeta assessed Plaintiff with lower back pain (lumbago[10]) and a herniated lumbar disc. (Tr. 319).

Dr. Brotea next saw Plaintiff on May 2, 2013. (Tr. 316, *repeated* 334). Dr. Brotea again assessed that Plaintiff had lower back pain (lumbago) and a herniated lumbar disc. (*Id*.) Upon his physical examination, he found that Plaintiff did not have "any focal neurologic deficits" or "evidence of radiculopathy or myelopathy.[11]" (*Id*.) During the examination, Plaintiff stated that she understood that she was not a surgical candidate. (*Id*.) Given Plaintiff's back pain, however, Dr. Brotea considered providing Plaintiff with an SI joint injection for diagnostic and therapeutic purposes. (*Id*.)

**2. Medical Treatment After Alleged Onset Date of November 21, 2013**

a. <u>Dr. Steven Klass, Neurologist</u>

On January 10, 2014, Plaintiff returned to Dr. Klass for a follow-up appointment. (Tr. 176). Dr. Klass found that Plaintiff had a moderate degree of disability, that she should limit her physical therapy, and that she should return to pain management. (*Id*.) On September 22, 2014,

---

[10] Lumbago is "a nonmedical term for any pain in the lower back." *Dorland's Illustrated Medical Dictionary,* 1076 (32nd ed. 2012).

[11] Myelopathy is "1. [A]ny of various functional disturbances or pathological changes in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis. 2. [A] pathological condition of the bone marrow." *Dorland's Illustrated Medical Dictionary,* 1220 (32nd ed. 2012).

Dr. Klass examined Plaintiff again and found that she was totally disabled. (Tr. 269). On November 12, 2014, Dr. Klass noticed that Plaintiff had returned to a moderate degree of disability (50-60%). (Tr. 270). Dr. Klass also stated that Plaintiff had not reached maximum medical improvement because: "1) [Plaintiff] [c]ould benefit from further epidural injections, 2) [Plaintiff] [was] not taking any medication at this point in time, [and] 3) [Plaintiff] could be considered for [a] back strengthening exercise program." (*Id*.) On December 20, 2014, Dr. Klass found that Plaintiff's degree of disability was the same as her previous visit. (Tr. 271). He opined that Plaintiff was possibly suffering from a "soft tissue (muscle) problem," which prevented her from being a suitable candidate for surgery. (*Id*.) Upon examination on February 5, 2015 and March 17, 2015, Dr. Klass found that Plaintiff's back pain had remained unchanged. (Tr. 272–73). By April 21, 2015, however, Plaintiff's degree of disability had decreased to a mild degree (33%). (Tr. 274). On June 22, 2015, Plaintiff's degree of disability remained mild at 33%. (Tr. 275).

While Plaintiff continued to complain of pain in her left side, Dr. Klass opined that she had a "rather benign MRI scan" and her EMG study and lumbar spine were both normal. (*Id*.) On July 22, 2015, Plaintiff's degree of disability remained mild at 33%. (Tr. 276). She had no noticeable muscle spasms, but she did show lumbar muscle spasms when Dr. Klass directly palpated the region. (*Id.*) Additionally, Plaintiff was taking Neurontin,[12] which she reported seemed to help. (*Id*.) On September 21, 2015, Plaintiff's degree of disability had again increased

---

[12] Neurontin is the brand name for gabapentin, an anticonvulsant (antiseizure) drug that is sometimes used to treat back spasms. *See* Neurontin Medication Guide, *available at* https://www.pfizermedicalinformation.com/en-us/neurontin/medguide (last visited Feb. 28, 2019).

to moderate at 66%. (Tr. 277). Since Plaintiff restarted Neurontin, the pain in her lower back and leg decreased. (*Id*.) Plaintiff's examination on October 21, 2015 produced similar results to those of her previous visit. (Tr. 278). By November 23, 2015, however, Plaintiff's degree of disability had increased to 100%. (Tr. 279). Plaintiff stated that she continued having lower back pain, with pain radiating into her left leg. (*Id*.) Additionally, she was never truly comfortable and was ready to have surgery if her physicians recommended it. (*Id*.) On December 21, 2015, Plaintiff reported that her symptoms had remained the same. (Tr. 280). Although Plaintiff's degree of disability had decreased to 33%, because she was not responding to medication, epidural steroids, or a physical therapy program, Dr. Klass decided to refer Plaintiff to a spinal surgeon. (*Id*.)

Dr. Klass continued to examine Plaintiff into 2016. On January 16, 2016, Dr. Klass found that Plaintiff's degree of disability was again moderate at 66%. (Tr. 260). Dr. Klass found that Plaintiff continued to suffer lower back pain that traveled into her left leg. (*Id*.) Plaintiff's symptoms remained the same upon her re-examination on February 25, 2016. (Tr. 259, repeated 282). Dr. Klass stated that Plaintiff was evaluated by a spine surgeon and was told that she was not a candidate for spine surgery. (*Id*.) Dr. Klass stated in his March 24, 2016 evaluation that Plaintiff's symptoms remained the same and he considered whether Plaintiff should proceed with a water-soluble myelogram–CT so that her lumbar region and spinal nerve could be evaluated. (Tr. 258). On May 4, 2016, Dr. Klass noted that a spine surgeon who had evaluated her twice found that she did not warrant surgical intervention. (Tr. 257, *repeated* 284). Dr. Kline also opined that he was not sure what the next step was, but he received permission to proceed with a non-contrast MRI scan of Plaintiff's cervical region. (*Id*.)

b.  Dr. Mark Weigle, Physiatrist

Plaintiff continued to visit Dr. Weigle through 2014. On March 4, 2014, Dr. Weigle found

that Plaintiff was alert, oriented, and not in acute distress. (Tr. 195–96). During the

examination, Plaintiff stated that while her pain level was between a zero-to-three out of ten,

some days it reached a six out of ten. (Tr. 195). Her pain levels increased when she stood up

from a seated position. (*Id.*) Plaintiff also informed Dr. Weigle that in the past year, she had

received four injections to treat her back pain. (*Id.*) Dr. Weigle's impression from the physical

exam was that Plaintiff had lower back pain and SI joint dysfunction/disorder of sacrum. (*Id.*)

c.  Dr. Marc Samolsky, Pain Management Specialist

Plaintiff sought the care of Marc Samolsky, M.D., for pain management for her muscle

spasms, lumbar radicular pain, and left sacroiliac joint pain. (Tr. 216). From 2014 to 2016,

Plaintiff visited Dr. Samolsky many times and she often made similar complaints. (Tr. 239–46).

Plaintiff also consistently found that she felt "significant pain relief" after her epidural steroid

injections. (Tr. 244). The relief from the shots, however, sometimes lasted only for three weeks,

other times they would last six to eight weeks. (Tr. 241–42, 244). Plaintiff continued to suffer

lower back pain on her left side. (Tr. 239). She also suffered radiating pain down both legs,

laterally in the thighs and into the feet, where she also felt tingling. (*Id.*)

d.  Dr. Christian Brotea, Orthopedist and Dr. John Olsewski, Surgeon

On January 4, 2016, Dr. Brotea re-examined Plaintiff due to her persistent lower back

pain. (Tr. 314). Dr. Brotea examined Plaintiff's new MRI, which showed "evidence of very mild

disc bulging at the L3-4/L4-5 levels without significant central canal stenosis of the existing

nerve roots." (*Id.*) Upon further physical examination, Dr. Brotea found that Plaintiff did not

have "any focal neurologic deficits" or any evidence of "radiculopathy or myelopathy." *Id*.

Additionally, Dr. Brotea opined that while Plaintiff was not a candidate for surgery, he would

consider a sacroiliac injection for diagnostic and therapeutic purposes.

Dr. Samolsky referred Plaintiff to John Olsewski, M.D. (Tr. 244). Dr. Olsewski also

recommended against surgery. (Tr. 239). Dr. Olsewski referred Plaintiff to see Dr. Gabal for a

spinal cord simulator consultation, since Plaintiff might be "an excellent candidate." (Tr. 239,

323).

### e. **EMG and NCV Testing**

On April 30, 2014, Dr. Sam Mazabreb performed EMG and nerve conduction tests pm

Plaintiff. (Tr. 293–96). Dr. Mazabreb opined that his electrophysiological findings were highly

suggestive of a left L5/S1 radiculopathy in the lower extremity. (Tr. 296). Dr. Mazabreb noted

that the findings correlated with Plaintiff's symptoms and that further evaluation of the lumbar

spine was recommended. (*Id*.) Dr. Mazabreb advised Plaintiff to continue "conservative

chiropractic treatment" with her attending physician. (*Id*.)

### 3. **Consultative Examiner Report**

#### a. **Dr. Julia Kaci, Internist**

On August 4, 2014, Julia Kaci, M.D., based on referral from the New York State Division

of Disability Determination, performed an orthopedic examination of Plaintiff. (Tr. 218–22).

Plaintiff stated that she suffered from lower back pain that shot down her left leg and that she

was unable to sit for more than one-to-two hours and stand for more than ten to fifteen

minutes. Additionally, since she was unable to cook, clean, and shop by herself, her children

assisted her with these tasks. (Tr. 218). Upon examination, Dr. Kaci found Plaintiff to be in "no

acute distress" but that her "gait was antalgic and slow." (Tr. 219). Dr. Kaci further noted that

Plaintiff was unable to walk on her heels and toes due to back pain and that she was able to

squat halfway with help. (*Id*.) Plaintiff needed no help changing before or after the examination

or getting on and off the exam table. (*Id*.) Dr. Kaci found that Plaintiff had moderate limitations

to sitting, bending, squatting, and walking and had marked limitations to lifting, carrying, and

standing. (Tr. 220). Dr. Kaci diagnosed Plaintiff with lower back pain, a history of disc herniation

and radiculopathy, and left sciatica. (*Id*.)

    **D.**  **Non-Medical Evidence**

      **4.**  **August 3, 2016 Hearing Before the ALJ**

        **a.**  **Plaintiff's Testimony**

Plaintiff appeared at the August 3, 2016 administrative hearing with her attorney. (Tr.

26–43). Plaintiff stated that before her accident, she "was 100 percent healthy." (Tr. 32).

Plaintiff stated that she has "real bad sciatica," which causes her constant pain, (Tr. 28), and

that her left side hurt more than her right side. (Tr. 29). Plaintiff testified that she has pain in

her right shoulder, upper back, and lower back. (*Id*.) Plaintiff also stated that after her MRI, she

learned that she had two bulging discs, which cause her back pain. (*Id*.)

Because of the pain, she testified, it is hard for her to do "any walking, sitting, [and]

sleeping." (Tr. 28). Plaintiff feels pain first thing in the morning and takes up to ten minutes for

her to get out of bed. (Tr. 30). She stated that the pain also interferes with mundane tasks, such

as "carrying groceries, doing laundry . . . [and] getting into [ ] bed." (Tr. 29). Plaintiff sometimes

needs her children to help her dress. (Tr. 38). Although Plaintiff does not have a driver's license,

she testified that she is able to use a taxi or train. (Tr. 40). Additionally, she stated that she

plans on flying to Georgia. (Tr. 40). She is able to walk for twenty to thirty minutes before she feels pain. (Tr. 37). Additionally, Plaintiff testified that when she takes her medication, she is able is to sit for longer periods of time. (Tr. 36).

To offset the pain, Plaintiff takes gabapentin (also known as Neurontin) about four times a day. (Tr. 30–31). Side effects of gabapentin for her are dizziness and blurred motion. (Tr. 36). Plaintiff testified that she has depression. (Tr. 31).

Plaintiff testified that prior to her injury, she was a custodian (Tr. 35). As a custodian, she would "mop, sweep, take out garbage, [and] move furniture or any rubbish." (*Id*.) Additionally, she would lift furniture, garbage, or "anything that was left to take out to the garbage, practically everything [and] anything." (*Id*.) Plaintiff stated that since the date of her injury, she has been unable to complete any of these tasks. (*Id*.) After questioning from the ALJ about what work she could perform, Plaintiff testified that she should be able to do "light work," such as secretarial work or work as a customer representative. (*Id*.)

Plaintiff's primary source of income comes from the Worker's Compensation she receives as well as her daughter's social security survivor benefits. (Tr. 41–42). Plaintiff testified that she is moving to Georgia because it is more affordable and has a better school district for her daughter. She has been working with the Workers' Compensation Board to find doctors in Georgia who would be able to implement the spinal stimulator. (Tr. 42).

    b. Vocational Expert Testimony

Vocational expert ("VE") Dr. Greene testified at the August 3, 2016 hearing. (Tr. 43–50). Dr. Greene testified that Plaintiff's job qualified as a custodian, under *Dictionary of Occupational Titles* (DOT) code 382.664-010, with an SVP: 3, which is a semi-skilled position at a

medium level of exertion. (Tr. 44). Although Dr. Greene testified that Plaintiff's injury would preclude her from working as a custodian, there were nonetheless many roles that plaintiff perform. (Tr. 45). These roles considered an individual with Plaintiff's age, education, work history, and limited range of sedentary exertional work with no more than occasional postural positions, including crouching, crawling, stooping, kneeling, balancing and climbing of stairs. (*Id.*) Dr. Green testified that these jobs are plentiful in the national economy. (*Id*.) These roles include: order clerk, DOT code 209.567-014, SVP: 2, unskilled at a sedentary level, with 70,000 jobs in the national economy; addresser, DOT code 209.587-010, SVP: 2, unskilled at a sedentary level, 180,000 jobs in the national economy; and toy stuffer, DOT code 731.685-014, SVP: 2, unskilled and sedentary level, with 200,000 jobs in the national economy. (Tr. 45–46).

## III. **Analysis**

### A. **Applicable Legal Principles**

#### 1. **Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support the determination or whether it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012); *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).[13] Moreover, the court cannot "affirm an

---

[13] The standards that must be met to receive supplemental security income benefits under Title XVI of the Social Security Act are the same as the standards that must be met in order to receive DIB under Title II of the statute. *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Accordingly, cases addressing either claim are equally applicable to the issues before the Court.

administrative action on grounds different from those considered by the agency." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Burgess*, 537 F.3d at 128).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The Supreme Court has defined "substantial evidence" as "more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Talavera*, 697 F.3d at 151. Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Selian*, 708 F.3d at 417 (citation omitted).

### 2. **Determination of Disability**

A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months). In addition, to obtain DIB, the claimant must have become disabled before the date on which he was last insured. *See* 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; *McKinstry v. Astrue*, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be "of such severity" that the claimant cannot perform her previous work and "cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (internal quotation marks omitted)).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 404.1520(a)(4)(i)—(v); *see Selian*, 708 F.3d at 417-18; *Talavera*, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If she is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). If she does, the inquiry at the third step is whether any of these impairments meet one of the Listings in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). To be found disabled based on a Listing, the claimant's medically determinable impairment must satisfy all of the criteria of the relevant Listing. 20 C.F.R. § 404.1525(c)(3); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007) (summary order). If the claimant meets a Listing, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the Listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform her past relevant work given her RFC. 20 C.F.R. § 404.1520(a)(4)(iv); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If she cannot, then the fifth step requires assessment of whether, given claimant's RFC, she can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If she cannot, she will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

RFC is defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."

*Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (quoting Social Security Ruling

96-8p, 1996 WL 374184, at *1 (July 2, 1996)). The results of this assessment determine the

claimant's ability to perform the exertional demands[14] of sustained work which may be

categorized as sedentary, light, medium, heavy or very heavy. 20 C.F.R. § 404.1567; *see Schaal

v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998). This ability may then be found to be limited

further by non-exertional factors that restrict claimant's ability to work. *See Michaels v. Colvin*,

621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d

Cir. 2010).

     The claimant bears the initial burden of proving disability with respect to the first four

steps. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to

prove that the claimant's RFC allows the claimant to perform some work other than her past

work. *Selian*, 708 F.3d at 418; *Burgess*, 537 F.3d at 128; *Butts v. Barnhart*, 388 F.3d 377, 383 (2d

Cir. 2004), *amended in part on other grounds on reh'g*, 416 F.3d 101 (2d Cir. 2005).

     In some cases, the Commissioner can rely exclusively on the Medical-Vocational

Guidelines contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination

at the fifth step. *Butts*, 388 F.3d at 383. "The [Medical-Vocational Guidelines] take[ ] into

account the claimant's RFC in conjunction with the claimant's age, education and work

---

[14]Exertional limitations are those which "affect [plaintiff's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b). In contrast, non-exertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching. 20 C.F.R. § 404.1569a(c).

experience. Based on these factors, the [Medical-Vocational Guidelines] indicate[ ] whether the claimant can engage in any other substantial gainful work which exists in the national economy." *Pagan v. Colvin*, 15-CV-3117 (HBP), 2016 WL 5468331, at *9 (S.D.N.Y. Sept. 29, 2016) (quoting *Gray v. Chater*, 903 F. Supp. 293, 298 (N.D.N.Y. 1995) (internal quotation marks omitted; alterations in original)); *see Butts*, 388 F.3d at 383.

### 3. **Treating Physician Rule**

The "treating physician rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.[15] A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *Diaz v. Shalala*, 59 F.3d 307, 313 n.6 (2d Cir. 1995); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Schisler*, 3 F.3d at 568; *Burris v. Chater*, 94-CV-8049 (SHS), 1996 WL 148345, at *4 n.3 (S.D.N.Y. Apr. 2, 1996). The Second Circuit has noted that it "do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion." *Morgan v. Colvin*, 592 F. App'x 49, 50

---

[15] Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017); a*ccord Cortese v. Comm'r of Social Sec.*, 16-CV-4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017).

(2d Cir. 2015) (summary order) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004));

*accord Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (c) (2)—(6); *Schisler*, 3 F.3d at 567; *Mitchell v. Astrue*, 07-CV-285 (JSR), 2009 WL 3096717, at *16 (S.D.N.Y. Sept. 28, 2009); *Matovic v. Chater*, 94-CV-2296 (LMM), 1996 WL 11791, at *4 (S.D.N.Y. Jan. 12, 1996). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran*, 362 F.3d at 32-33; *see also Atwater*, 512 F. App'x at 70; *Petrie v. Astrue*, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); *Kennedy v. Astrue*, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order). "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record." *Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) (summary

order) (citation omitted); *see also Monroe v. Comm'r of Social Sec.*, 676 F. App'x 5, 7 (2d Cir.

2017) (summary order). The ALJ is responsible for determining whether a claimant is "disabled"

under the Act and need not credit a treating physician's determination to this effect where it is

contradicted by the medical record. *See Wells v. Comm'r of Soc. Sec.*, 338 F. App'x 64, 66 (2d

Cir. 2009) (summary order). The ALJ may rely on a consultative opinion where it is supported by

substantial evidence in the record. *See Richardson*, 402 U.S. at 410; *Camille v. Colvin*, 652 F.

App'x 25, 27-28 (2d Cir. 2016) (summary order); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir.

1995); *Mongeur*, 722 F.2d at 1039.

### 4.  <u>Credibility</u>

In determining a claimant's RFC, the ALJ is required to consider the claimant's reports of

pain and other limitations, 20 C.F.R. §§ 404.1529, 416.929, but is not required to accept the

claimant's subjective complaints without question. *McLaughlin v. Secretary of Health, Educ. &*

*Welfare*, 612 F.2d 701, 704–05 (2d Cir. 1980). "It is the function of the [Commissioner], not [the

reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses,

including the claimant." *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d

Cir. 1983); *see Mimms v. Heckler*, 750 F.2d 180, 185–86 (2d Cir. 1984); *Aponte v. Secretary,*

*Dep't of Health & Human Servs.*, 728 F.2d 588, 591–92 (2d Cir. 1984). The ALJ has discretion to

weigh the credibility of the claimant's testimony in light of the medical findings and other

evidence in the record. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

The regulations provide a two-step process for evaluating a claimant's subjective

complaints:

> At the first step, the ALJ must decide whether the claimant suffers
> from a medically determinable impairment that could reasonably

be expected to produce the symptoms alleged. 20 C.F.R. §
404.1529(b). That requirement stems from the fact that subjective
assertions of pain alone cannot ground a finding of disability. 20
C.F.R. § 404.1529(a). If the claimant does suffer from such an
impairment, at the second step, the ALJ must consider "the extent
to which [the claimant's] symptoms can reasonably be accepted as
consistent with the objective medical evidence and other
evidence" of record. Id. The ALJ must consider "[s]tatements [the
claimant] or others make about [her] impairment(s), [his]
restrictions, [his] daily activities, [his] efforts to work, or any other
relevant statements [he] make[s] to medical sources during the
course of examination or treatment, or to [the agency] during
interviews, on applications, in letters, and in testimony in [its]
administrative proceedings." 20 C.F.R. § 404.1512(b)(3); *see also* 20
C.F.R. § 404.1529(a); S.S.R. 96-7p.

*Genier*, 606 F.3d at 49. The ALJ must explain the decision to reject a claimant's testimony "'with

sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate

reasons for the ALJ's disbelief and whether [the ALJ's] decision is supported by substantial

evidence.'" *Calzada v. Astrue*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010). The ALJ's credibility

determination is entitled to deference. *See Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999)

("After all, the ALJ is in a better position to decide issues of credibility."); *Gernavage v. Shalala*,

882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's

determination because he heard plaintiff's testimony and observed his demeanor.").

**B. The ALJ's Decision**

The ALJ applied the five-step analysis described above and determined that Plaintiff was

not disabled. (Tr. 11–21). As an initial matter, the ALJ found that Plaintiff met the insured status

requirements of the Social Security Act though December 31, 2017. (Tr. 13). At step one, the

ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset

date of November 21, 2013.

At step two, the ALJ found that Plaintiff had two severe impairments as defined in 20 C.F.R. § 404.1520(c): degenerative disc disease with herniation at L5-S1; and left L5-S1 radiculopathy. (Tr. 13). The ALJ found that although Plaintiff self-reported depression, there was no diagnosis of depression or medical evidence demonstrating depression, and thus the condition was not medically determinable in accordance with 20 C.F.R. § 404.1508. (*Id.*)

At step three of the analysis, the ALJ held that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 18–19. (*Id.*) The ALJ gave special consideration to Listing 1.04 for spinal disorders. (*Id.*) The ALJ found that Plaintiff's impairment did not meet or reach the severity required by Listing 1.04. (*Id.*)

The ALJ then determined that Plaintiff retained the RFC to perform sedentary work[16] "except the claimant can perform no more than occasional postural positions of crouching, crawling, stooping, kneeling, balancing, and climbing stairs." (Tr. 14). To reach his RFC determination, the ALJ examined Plaintiff's symptoms and the extent to which her symptoms were reasonably consistent with the objective medical evidence and other evidence. (Tr. 14). The ALJ also considered the opinions of the treating and consulting physicians. (Tr. 14–19).

The ALJ gave "little weight" to Dr. Klass's opinion that Plaintiff would need to take unscheduled breaks or alternate positions because he found that the opinion was not

---

[16] The regulations define "sedentary work" as that work which:
    involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
20 C.F.R. § 404.1567(a).

supported by objective signs or findings. (Tr. 18). The ALJ also gave "little weight" to Dr. Kaci's

opinion that Plaintiff has marked limitations to lifting, carrying, and standing, and moderate

limitations to sitting, walking, bending, and squatting because he found that the opinion was

unsupported by Dr. Kaci's own findings. (Tr. 18).

The ALJ gave "great" weight to independent medical examiner Dr. Zitzmann's opinion,

which predated Plaintiff's alleged onset date, and summarized that opinion as follows:

> A series of independent medical examinations performed by Erik
> Zitzmann MD (Exhibit 15F) indicated the presence of low back pain
> and radiculitis associated with a work related injury in June 2012.
> Symptoms of pain and limitation on his February 2013
> examination were considered subjective and markedly
> exaggerated. These included marked restriction of back motion
> without palpable spasm, negative straight leg raising sitting with
> markedly positive straight leg raising in the lying position, extreme
> tenderness to even light touch and poor effo1t in motor testing in
> the absence of any measurable atrophy (Exhibit 15F, pages 8 and
> 9). Noting the claimant's stated reluctance to return to her former
> work as a custodian, as it involved heavy duties with no light work
> duties available, he indicated a partial marked degree of disability.
> On his final examination in August 2013, Dr. Zitzman [*sic*]
> referenced the absence of alarming MRI findings, but also noted a
> mild degree of atrophy of the left calf, positive straight leg raising,
> limitation of back movement, while also noting low back and left
> sacroiliac tenderness on examination. He opined that the claimant
> could lift and carry up to 20 pounds and was limited to no
> repeated or prolonged bending (Exhibit 15F, page 4). He indicated
> that she would be unable to return to her work as a custodian, as
> only heavy work was available, but nevertheless indicated that the
> claimant was capable of some work activity with the above-noted
> restrictions.
>
> (Tr. 17).

But later on in his decision, the ALJ determined that certain of Dr. Zitzmann's opinions

should be given "little" weight, explaining that:

Dr. Zitzman [*sic*] opined that the claimant would be unable to work as a custodian, because no light duty was available (Exhibit 5F). To the extent that the opinions from this and other physicians refer to claimant's inability to do her past work, the opinions are consistent with the evidence and the undersigned gives them great weight. **To the extent, however, that the opinions can be construed to opine that claimant is disabled from any work, I give the opinions little weight because they are not consistent with the longitudinal evidence, contemporaneous statements made by the claimant that she was looking forward to other employment** (Exhibit 15F) **[a]nd with the history of conservative treatment.**

(Tr. 19) (emphasis supplied).

The ALJ also considered Plaintiff's testimony and found that while Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, a review of the entire case record showed that Plaintiff's testimony regarding their intensity, persistence, and limiting effects were not entirely credible. (Tr. 14, 18). The ALJ pointed out that Plaintiff's description of her daily activities and use of public transportation indicated that she was not as limited as she claimed. (Tr. 18). The ALJ also found that Plaintiff's credibility was undermined by the fact that she was "not in any obvious pain or discomfort when walking in or out of the hearing room or while sitting during the course of the hearing." (*Id.*) The ALJ further noted that Plaintiff "lacked the general physical appearance of a person who might have been experiencing prolonged or severe pain," but that he did not "rely solely on the claimant's appearance in assessing the consistency of her symptoms." (*Id.*)

C. <u>Analysis of the ALJ's Decision</u>

Plaintiff argues that remand is required because the ALJ failed to give controlling weight to the opinions of Plaintiff's treating physicians, Dr. Klass and Dr. Weigle, and that, therefore,

the ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence. Defendant

argues that the Commissioner's decision is supported by substantial evidence.

### 1. **Treating Physician Rule**

Remand is warranted because the ALJ misapplied the treating physician rule and thus

Plaintiff's RFC is not supported by substantial evidence. The ALJ gave "little weight" or "some

weight" to Dr. Klass's opinions, stating:

> The undersigned has also evaluated an opinion from Dr. Steven Klass, who opined, *inter alia*, that the claimant could work at a full time job that does not require the use of her back and legs and could lift up to 20 pounds. He indicated that the claimant could sit, stand and walk up to 4 hours in an eight-hour workday, but must get up and move around from sitting every 50 minutes (Exhibit 9F). However, he also, indicated that the claimant's condition did not limit her ability to handle, reach, grasp or feel during an 8 hour workday. To the extent that the opinions from Dr. Klass refer to the claimant's need to take unscheduled breaks or alternate positions, **the opinions are given little weight**. They are not supported by the objective clinical findings contained in his own treatment records which show generally mild abnormalities with mostly mechanical low back pain, no focal weakness and EMG/NCS studies, which he interpreted as normal (Exhibits 1F and 10F). Subsequent EMG nerve conduction studies yielded findings suggestive of L5-S1 radiculopathy, but the claimant nevertheless continued to indicate her belief that she could return to some form of light duty work, even if she couldn't perfom her previous heavy job[17] (Exhibits 2F, page 2 and 14F). Otherwise, the opinion is given some weight.

> (Tr. 18) (emphasis added).

---

[17] As will be discussed in § III.C.2, *infra*, the ALJ determined that Plaintiff's subjective assertions of her pain were *not* credible, but he credits her statement that she believed that she could return to light work. (*See* Tr. 21–22). The ALJ asked Plaintiff what she thought she was "able to do . . . in light of [her] current situation?" (Tr. 35). Plaintiff responded that she is "able to do light work . . . . I tried to, to go for secretarial." But before the hearing ended, Plaintiff told the ALJ that she "was very nervous" during the proceeding (Tr. 49). Plaintiff's own assertion, in response to the ALJ's question, is not supported by the objective medical evidence and thus the ALJ further erred in relying on portions of Plaintiff's testimony while finding her testimony not credible.

Further, the ALJ concluded that Plaintiff could do sedentary work "except the claimant can perform no more than occasional postural positions of crouching, crawling, stooping, kneeling, balancing and climbing stairs." (Tr. 14). Sedentary work "involves sitting," with occasional "walking and standing," 20 C.F.R. § 416.967(a), but the "inability to sit for long periods of time" is a limiting factor that can prevent a person from performing sedentary work. *See* 20 C.F.R. § 416.967(b). The ALJ's analysis of the treating physician rule is flawed because, contrary to the ALJ's findings, Dr. Klass's opinions regarding Plaintiff's need for breaks and alternate positions during the workday, including a sit/stand option, *are* supported by the objective medical record, and are consistent with the opinions of Plaintiff's other treating and consulting physicians. Thus, the reasons the ALJ provided for discounting Dr. Klass's opinions—that his opinions are not supported by "objective clinic findings"—are not "good reasons" for declining to afford Dr. Klass's opinions controlling weight. (Tr. 18; *see* 20 C.F.R. § 404.1527(c)(2)).

The ALJ's analysis of the treating physical rule as applied to Dr. Weigle, on the other hand, was correct. Plaintiff argues that the ALJ should have given controlling weight to Dr. Weigle's opinion, (Pl.'s Mem. of Law at 18–19), but a review of the record shows that Dr. Weigle did not provide any medical opinion on Plaintiff's function abilities or limitations, and thus there was no need for the ALJ to apply the rule to him. *See* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").

### a. The ALJ Misapplied the Treating Physician Rule in the Assessment of Plaintiff's Need for Unscheduled Breaks and a Sit/Stand Option

Contrary to the ALJ's finding, there is evidence in the record to support Dr. Klass's opinion that Plaintiff would need unscheduled breaks and alternate positions during the workday. As the ALJ recognized, Plaintiff suffers from degenerative disc disease.[18] Objective evidence in the form of MRIs, EMG and NCV nerve tests, as well as treatment notes by Dr. Klass and other physicians who examined Plaintiff, support Dr. Klass's assessment of Plaintiff's inability to perform work without unscheduled breaks and alternate positions.

As an initial matter, the objective evidence in the form of MRIs of Plaintiff's lumbar spine from 2015 and 2016 provide clinical support for Dr. Klass's conclusions regarding Plaintiff's inability to sit for extended periods of time. (Tr. 261, 283). For example, a 2015 MRI of Plaintiff's lumbar spine showed that there was a small bulge with extension of disc at L4-L5 and a small posterior protrusion/extension of disc at L5/S1. (Tr. 261). In 2016, an MRI showed disc material in both neural foramen at L5/S1 with "some compromise of the S1 nerve roots." (Tr. 283). Moreover, as the ALJ noted, the EMG and NCV nerve tests were "highly suggestive of a left L5/S1 radiculopathy," even though they returned results within normal limits. (Tr. 296, *see* Tr. 17). Thus, the ALJ's conclusion that Dr. Klass's opinion is "not supported by objective clinical findings in his own records" is inaccurate. (Tr. 18).

---

[18] Degenerative disc disease is associated with aching pain in the back or neck and may make everyday movements difficult. "Degenerative Disc Disease in Adults," *available at* http://nyulangone.org/conditions/degenerative-disc-disease-in-adults (last visited Feb. 27, 2019); *see also* Cedars-Sinai, "Degenerative Disc Disease," https://www.cedars-sinai.org/health-library/diseases-and-conditions/d/degenerative-disc-disease.html (last visited Feb. 27, 2019).

Further, Dr. Klass's treatment notes support his opinion in this regard. Dr. Klass found on several occasions that Plaintiff had back pain with pain radiating into her extremities. (Tr. 270, 272, 276, 278, 279). For example, as early as February 2013, Dr. Klass found that Plaintiff had limited range of motion in her lumbar spine, limited ability to perform a straight leg raise, and pain in her left buttock. (Tr. 183). Similarly, in June 2013, Dr. Klass found that her range of motion in her lumbar region was reduced and that Plaintiff had limited ability to perform a straight leg raise. (Tr. 180). Dr. Klass's assessment that Plaintiff must "get up and move around every 50 min[utes] and cannot sit again for 20 minutes, (Tr. 251), is thus supported by his own treatment notes.[19] Even though these findings occur before Plaintiff's alleged onset date of November 21, 2013, they are consistent with a continuing injury predating and postdating the onset date. (*See, e.g.*, Tr. 269 (September 22, 2015 notes of Dr. Klass) ("[Plaintiff] [c]ontinues to have severe low back pain")).

The assessments by Plaintiff's other physicians also support Dr. Klass's opinion regarding Plaintiff's inability to sit for extended periods of time. Consulting examiner Dr. Kaci found in August 2014 that Plaintiff's cervical spine had limited range of motion and a positive straight leg raise test at 45 degrees bilaterally. (Tr. 219). Thus, Dr. Kaci found that Plaintiff had moderate limitations to sitting and walking and marked limitations to standing. (Tr. 220).

Similarly, in January 2016, Dr. Brotea examined Plaintiff and found that, based on a new MRI, she had mild disc bulging at L3-4/L4-5, in addition to a small disc budge at L5-S1, and low

---

[19] The ALJ is correct that Dr. Klass's treatment records generally showed "mild abnormalities with most mechanical low back pain, no focal weakness," and normal EMG and NVC studies. (Tr. 18). But the ALJ then explains that subsequent EMG and NVC studies did yield findings "suggestive of L5-S1 radiculopathy." (*Id.*)

back pain based on this bulging. (T. 214). In April 2013, Dr. Brotea examined Plaintiff and found that she had "severely depressed range of motion of the lumbar spine with flexion and extension due to pain." (Tr. 319). The assessments of Dr. Kaci and Dr. Brotea support Dr. Klass's opinion regarding Plaintiff's physical limitations.

The ALJ's misapplication of the treating physician rule was not harmless because Dr. Klass's assessment of Plaintiff's ability to sit for extended periods of time would have changed his analysis Plaintiff's RFC. Accordingly, I recommend that remand is necessary for reconsideration of Plaintiff's RFC.

### 2. Evaluation of Plaintiff's Credibility

Plaintiff also argues that the ALJ did not properly assess her credibility. (Pl.'s Mem. of Law at 21). Specifically, Plaintiff argues that the ALJ's determination that her subjective allegations were inconsistent with her daily activities was improper. (*Id.* at 21–22). The ALJ assessed Plaintiff's credibility correctly.

As noted above, although the ALJ recognized that Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, a review of the entire case record showed that Plaintiff's testimony regarding their intensity, persistence, and limiting effects was not entirely credible. (Tr. 14). He also found that Plaintiff's statements regarding her pain and discomfort were not credible because her "behavior and presentation at the hearing was inconsistent with the alleged severity of the symptoms." (Tr. 18).

When considering the credibility of a claimant, "the ALJ's task is to consider the extent to which his self-reported symptoms could 'reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Tricarico v. Colvin*, 681 F. App'x 98,

101 (2d Cir. 2017) (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam)). "'The ALJ is free to accept or reject testimony' of a witness, provided that when a witness is found not to be credible, the ALJ provides findings with 'sufficient specificity to permit intelligible plenary review of the record.'" *Tricarico*, 681 F. Appx. at 101 (quoting *Williams v. Bowden*, 859 F.2d 255, 260-61 (2d Cir. 1988)).

The ALJ concluded that Plaintiff's claimed pain was not consistent with her testimony, as she testified that she was able to perform self-care activities and take public transportation as needed. (Tr. 18). The ALJ's finding is consistent with the objective medical record, which is devoid of any mention that Plaintiff cannot perform certain self-care activities or take public transportation as needed. Importantly, the medical record does not indicate that Plaintiff is in constant pain; rather, the indication is that Plaintiff cannot sit for extended periods of time without pain, requiring her to stand. Therefore, the ALJ did not err because his finding regarding the credibility of Plaintiff's subjective allegations concerning her daily activities and pain was consistent with findings in the record.

Even though the ALJ was correct in finding that Plaintiff's subjective allegations were not entirely credible, the ALJ's determination of Plaintiff's RFC was still incorrect because he failed to properly apply the treating physician rule. Because of this failure, the Court does not need to further analyze the ALJ's determinations. The Court does not recommend any findings as to Plaintiff's disability (or lack of disability), nor does the Court recommend any findings as to Plaintiff's RFC. Instead, the Court recommends remand to the Commissioner so that the treating physician rule can be properly applied to an analysis of Plaintiff's RFC.

## IV.    Conclusion

For the foregoing reasons, I respectfully recommend that the Commissioner's motion for judgment on the pleadings be **DENIED**, and that Plaintiff's motion for judgment on the pleadings be **GRANTED** to the extent that the case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.

## V.    OBJECTIONS

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable Analisa Torres, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Torres.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Respectfully submitted,

_____s/ Ona T. Wang_____

Dated: March 1, 2019                                                **Ona T. Wang**
       New York, New York                                    United States Magistrate Judge